UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ANDREW REINER,

Defendant.

**17-CR-70-RJA**

**SENTENCING MEMORANDUM AND CHARACTER LETTERS**

## INTRODUCTION

I represent the defendant, Andrew Reiner, in the above-captioned case. I submit this Memorandum in Aid of Sentencing in support of Andrew Reiner's request for a non-guideline sentence that is sufficient, but not greater than necessary. Attached to this Memorandum are the following exhibits submitted for the Court's consideration:

**Exhibit A**: University of the State of New York Education Department, High School Equivalency Diploma and related document

**Exhibit B:** Several Letters of Support from Family and Friends

**Exhibit C:** Letters related to Programs and Rehabilitation at Niagara County Jail

**Exhibit D:** Letters from Fellow Inmates at Niagara County Jail

## PROCEDURAL HISTORY AND ADVISORY GUIDELINES

Mr. Reiner plead guilty pursuant to a written plea agreement (Document No. 22) to a one count Information charging Attempted Possession of Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). The statutory maximum penalty for incarceration is 10 years.

The underlying facts are as follows:  Andrew Reiner met Victim 1 on a social media application ("App").  The two initially communicated with one another via the "App" and later communicated with one another via text messages using their cell phones.  Victim 1's profile on the social media app indicated that she was 18 years of age, but later as the two continued communicating, she advised Mr. Reiner that she was 16 years old.  From June 2016 through September 2016, the two communicated, engaged in sexual conversations and ultimately met and had sexual intercourse on at least two occasions.  In addition, in at least one of their conversations, Mr. Reiner asked Victim 1 to send him a sexually explicit photograph.

Pursuant to the terms of the plea agreement, the parties agreed that USSG §2G1.3(a)(3) applied to the offense of conviction and provided for a base offense level of 28.  The government and the defendant agreed that the following specific offense characteristics apply: the 2-level increase pursuant to USSG §2G1.3(b)(2)(B) (since the offense involved the undue influence of a minor to engage in prohibited sexual conduct): the 2-level increase pursuant to USSG §2G1.3(b)(3)(A) (since the offense involved the use of a computer to persuade, induce, entice, coerce or facilitate the travel of, a minor to engage in prohibited sexual conduct); and the 2-level increase pursuant to USSG §2G1.3(b)(4)(A) (since the offense involved a sexual act).  Following the anticipated application of the reduction for acceptance of responsibility, given Mr. Reiner's criminal history category of I, and the statutory maximum penalties for imprisonment, the resulting advisory guideline range is 108 to 120 months.  (Document No. 22, ¶ 16).

The guideline calculations contained in the Presentence Investigation Report ("PSR") mirror the calculations contained in the plea agreement.  The parties filed their respective

Statements with Respect to Sentencing Factors. Neither party objects to the facts and conclusions outlined in the PSR. Sentencing is scheduled for December 22, 2017 at 10:00am.

**SENTENCING FACTORS**

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines ("USSG") were no longer mandatory. Although the Court must still properly calculate and consider the advisory Guidelines range, the Court may not presume this advisory range is reasonable and need only give this range fair consideration before imposing a sentence. *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008). The advisory Guidelines range now serves as merely an initial benchmark for sentencing, which is ultimately considered along with other 18 U.S.C. § 3553(a) factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007). The section 3553(a) factors include: the characteristics of the offender and offense; the need for the sentence imposed; the legally available sentences; applicable policy statements of the Sentencing Commission; the need to avoid unwarranted sentencing disparity; and the need to provide restitution, where applicable. Section 3553(a) mandates that any sentence imposed be sufficient, but not greater than necessary to meet the basic goals of sentencing including retribution, deterrence, incapacitation, and rehabilitation.

In *Gall*, the Supreme Court made clear that sentencing courts have great discretion in formulating appropriate sentences. *Gall*, 552 U.S. at 51 (recognizing that the sentencing judge is in the "superior position" to impose a sentence based on the unique facts and circumstances of

the case). "[I]n the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *Jones*, 531 F.3d at 170 (quoting *Gall*, 552 U.S. at 50). In determining an appropriate sentence, 18 U.S.C. § 3553 mandates the Court to impose a sentence that is "sufficient, but not greater than necessary." Therefore, if the district court concludes that either of two sentences would properly serve the statutory purposes of § 3553(a), the lesser sentence must be imposed. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

A critical Supreme Court directive designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a particular guideline as a matter of policy. Because “the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines.” *Kimbrough*, 552 U.S. at 101-102 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the “Guidelines sentence itself fails properly to reflect § 3553(a) considerations”)); *see also Spears v. United States*, 555 U.S. 261, 266-67 (2009).

The Supreme Court has long acknowledged that modern penal philosophy tailors punishments to fit not only the offense, but also the offender. *See generally Williams v. New York*, 337 U.S. 241, 247-48 (1949).

**ANDREW REINER'S HISTORY AND CHARACTERISTICS AND THE NATURE OF THE OFFENSE**

Andrew Reiner, now age 30, is the son of Lyle and Lorraine Reiner. Andrew's childhood was plagued by the effects of alcohol abuse. He was born with fetal alcohol syndrome. His slightly younger brother was born with cerebral palsy. Both of Andrew's parents were alcoholics, and in fact, they met at an Alcoholics Anonymous meeting. Unfortunately, Alcoholics Anonymous was not successful for either of them. Andrew describes his parents as having been "drunk all the time. I don't recall a time where they were both not drinking a lot. (PSR ¶94). His mother's alcoholism caused her to suffer from dementia. She was placed in a nursing home when Andrew was very young. "I never really had a mom. My earliest memory of her was she was drunk and passed out on the couch and almost burned the house down. She developed dementia from all of her drinking and was placed in a home when we were young and was out of the house for a number of years…My mother eventually returned home but I never really felt like I have had a relationship with her." (PSR ¶94).

As to his father, Andrew described him as "an angry drunk" that "would give whippings to my brother and I, and was verbally abusive. His anger seemed to intensify with the alcohol." That physical and verbal abuse lasted until Andrew was 14 years of age, when his father had a heart attack. To his credit, since then, Lyle Reiner stopped smoking and drinking. (PSR ¶94).

Lyle Reiner described his regret at not having been more available to his children given his own alcoholism and that of his wife's. (PSR ¶96). He disclosed that he suffered from PTSD from having served in Vietnam and as a result was unable to work throughout much of Andrew's

life. The family lived on food stamps and public assistance for a time until he received disability benefits. In addition to alcoholism and PTSD, Lyle Reiner presently suffers from heart disease, leukemia, diabetes and asthma. Unfortunately, Andrew's brother suffers from alcoholism as well. (PSR ¶96). He has never worked and remains supported by his father, Lyle. Andrew was gainfully employed up until his arrest and he helped financially support the family, and also helped care for his mother and father when he resided with them.

Lyle describes Andrew as follows: "He has never drank or done drugs. He has had to learn to accept the way [his mother] is. He has always been upbeat and got the shyness out of all the others. He has worked hard to overcome as he was bullied as a child due to his size." (PSR ¶97). Andrew is small in stature standing at 5'5" and weighing 125 lbs.

Unfortunately, Andrew's lack of a solid parental figure impacted his relationships as he grew up. He never learned how to form appropriate romantic relationships and is quite emotionally immature.

Andrew has three children born out of wedlock. His first child, Ian Hyla-Reiner, age 9, was born to his "high school sweetheart." The two dated in 2004 to 2008 - starting when Andrew was just 17. The relationship ended before Ian was born. However, Andrew assisted financially with Ian's support until he was incarcerated on the instant offense.

Andrew's next child, Andrew Reiner, was born of a relationship with Leandra Gladden. The two were involved with one another for 5 years and lived together for much of their

relationship from 2010 to 2015. In fact, the only time that Andrew lived outside of his parent's home was during the time he was in a relationship with Ms. Gladden. When that ended, he returned home to live with his parents where he resided until his arrest for the instant offense in September 2016.

Andrew's youngest child was born from a relationship he had – and continues to have – with Angela Iheke, now age 19. Andrew met Angela on-line, when she was 17 years of age. They formed a relationship, and have a one-year old child together. The two remain in a committed consensual relationship.

Andrew received special education services from early childhood. He dropped out of high school after he had to repeat the 10th grade. However, since his incarceration on the instant offense, he completed his high school equivalency tests and was issued his General Equivalency Diploma on July 13, 2017. (See **Exhibit A**).

From the time Andrew dropped out of high school until he was arrested on the instant offense, he was employed full-time with Dollar General. He started out initially as a cashier earning minimum wage and over time was promoted to shift manager, and eventually to store manager earning a base salary of $43,000 annually. He lived at home with his parents and provided financial support to his children and the household.

Andrew has no criminal history points. He received a conditional discharge for a disorderly conduct in 2007 when he was 19 years of age. He has never been incarcerated before

his imprisonment on the instant offense. This offense is an aberration in Andrew's otherwise law abiding life.

With regard to the nature of the offense, Andrew remains extremely remorseful for his conduct. He was fully forthcoming regarding his conduct when he was arrested and never minimized his behavior. Andrew is not like other offenders charged with enticing minors[1] or attempting to possess child pornography. He never held himself out as anyone other than who he is; he did not lie about his age or identity; and never threatened the victim to engage in sexual conduct. Andrew began communicating with the victim when he believed her to be 18 years of age. He was not seeking an underage girl. Unlike others engaged in on-line communications as cyberpredators with minors, Mr. Reiner believed this victim to be of age when they first were in communication. Moreover, a search of Andrew's phone did not reveal any images of child pornography. He has not amassed a collection of pornographic images like others sentenced before this Court.

[1] 18 U.S.C. §2422(b). Subsection (b) was added to § 2422 in 1996 when Congress passed the Telecommunications Act of 1996. Two years later, the subsection was amended as part of the Child Protection and Sexual Predator Punishment Act of 1998, a bill that was described as "a comprehensive response to the horrifying menace of sex crimes against children, particularly assaults facilitated by computers." H.R. Rep. No. 105-557, at 10 (1998). The bill's legislative history reflects Congress's concern with cyberpredators interacting with minors online and its goal of addressing computer-related crimes against children "by providing law enforcement with the tools it needs to investigate and bring to justice those individuals who prey on our nation's children." *Id.* Congress emphasized the dangers posed by cyberpredators developing online relationships with minors, including the possibility of cyberpredators manipulating and exploiting minors. *See id.* at 11-12 (noting fact that "'cyber-predators' often 'cruise' the Internet in search of lonely, rebellious or trusting young people. The anonymous nature of the on-line relationship allows users to misrepresent their age, gender, or interests. Perfect strangers can reach into the home and befriend a child.").

Finally, Andrew admits that after the relationship developed and Victim 1 revealed that she was 16 years of age, he should have ended the contact. He did not and instead allowed the relationship to escalate and include sexual contact. He remains remorseful and regretful for his behavior and the impact it has had on the victim and her family.

These salient facts distinguish Andrew's conduct from other offenders and further support his requested non-guideline sentence.

**ANDREW REINER'S ACCEPTANCE OF RESPONSIBILITY**

Of particular importance to the Court's consideration is Andrew's acceptance of responsibility and comprehension of the gravity of his actions. From the time of his arrest on September 22, 2016, Andrew Reiner has accepted full responsibility for his conduct. In fact, after the Victim advised him that her family had contacted the police, she continued to attempt to contact him, and he refused to respond. When arrested, Andrew readily admitted to these on-line sexually explicit communications; the manner in which the relationship developed; his knowledge that she was under the age of 18 before they had sexual contact; and indicated that they may have had sexual contact 3 or 4 times in total. At no point in time did Andrew minimize his conduct. He is "disgusted, regretful and remorseful and has prayed for forgiveness." (PSR ¶52).

Unlike many other defendants, Andrew has a piqued understanding not only of the wrongfulness of his conduct, but of the negative consequences his conduct had on others.

## SUPPORT FROM FAMILY AND COMMUNITY

In the attached letters, Andrew's family and friends share with the Court what Andrew has done in the face of adversity. His family remains supportive of him. All the attached letters tell a story of Andrew Reiner, a kind, caring and compassionate man. Attached hereto as **Exhibit B**, are letters from Lyle Reiner – Andrew's father, Nathan Reiner – his brother, Alexandria Murphy, the mother of his oldest son, and Leandra Gladden, the mother of his younger son, and Angelina Iheke, his girlfriend and mother of his daughter.

His father, a two tour Vietnam veteran, describes how both he and Andy's mother were alcoholics, how his wife was placed in the Erie County Home and infirmary when Andrew started primary school. Lyle was left to raise the two boys by himself.

His brother, Nathan, describes Andrew as a cheerful and helpful person. "He is always the first one to volunteer to help someone, be it with a ride to work, moving, or even offering encouraging words to motivate someone.

Alexandria Murphy writes that "[w]hile incarcerated I have witnessed Andrews growth and understanding that his priorities in life were not where they should be. Andrew has expressed remorse over his decisions and the effects that its had on others' lives as well as his own. Andrew regularly reaches out to our son by phone and letters. He has taken up an interest in religion as a way to positively cope with his life stressors and has been trying to share this with our son as well."

Leandra Gladded describes Andrew as selfless, loyal and generous. Her letter details the efforts which Andrew made at providing for his son, by taking on a second job and his financial support of the family household. She says "I hope that I have been able to provide some insight into his character as a loving and generous person."

**ANDREW'S EXCEPTIONAL EFFORTS AT REHABILITATION**

Andrew has taken the time of his incarceration and put it to good use toward his rehabilitation. Annexed hereto as **Exhibit C**, letters related to Programs and Rehabilitation at Niagara County Jail from the following:

- Letter dated June 16, 2017 from Family and Children's Service of Niagara, Suzanne D. Cassick, Program Supervisor
- Letter dated June 5, 2017 from Orleans/Niagara BOCES, Shelly M. Smith
- Letter dated June 18, 2017 from Life Empowerment Program, Maureen O'Holloran, Social Worker and Group Facilitator
- Letter dated July 8, 2017 from John Kula, Pastor/Director/Chaplain
- Letter dated June 2, 2017 from Niagara County Correctional Facility, C.O. Richard Werth, Programs Director
- Letter from Charles White and David D. Pritchard, Instructors of Life Lessons, Niagara Holding Center
- Letter from Bobby Anderson, Executive Director of Culinary Training Program and accompanying Certificate of Completion

These letters demonstrate all of the hard work which Andrew has done to begin his rehabilitation. First, he successfully completed his GED. Andrew worked toward his personal

goal, but also helped his fellow classmates prepare for the test as well by participating in a study group on his pod. His teacher reports that Andrew was also leading a Bible study with other inmates and the he "lost the 'me' philosophy and turned it into the 'others' philosophy." This sentiment was echoed in the letter from Ms. O'Halloran, a social worker and group facilitator with Operation U-Turn, an Emotional Literacy and Empowerment Program at the Niagara County Jail:

> Operation U-Turn works exclusively with inmates and believes that incarceration is an opportunity for a person to work on their issues, heal their hearts, and change negative behaviors. Apparently, that is what Andrew has chosen to do during his time at the Niagara County Jail. Besides our class, I know for a fact that he has been working on this GED, and attends Parenting class. Today in class, he shared that he looks at his incarceration as an opportunity to work on himself and his own issues. He hopes to leave jail a better person than when he came in. he is reading all the material, doing the homework, encouraging others, and actively participating in class. We wanted you to see what we see in Andrew.

He also attended parenting classes and was described by Ms. Cassick as very cooperative, attentive, and an active participant in the classes. Those same adjectives were used by Instructors White and Pritchard to describe Andrew's participation in Lifes Lessons.

Andrew's faith has been persistent. Pastor Kula reports that Andrew has been attending bible study faithfully and has been respectful and considerate of others in his learning. As mentioned, in addition to his attendance at the bible study put on by Pastor Kula, Andrew leads a bible study group on his pod at Niagara County Jail. Annexed hereto as **Exhibit D** are letters from fellow inmates describing the positive impact that Andrew has had on their incarceration and outlook on their criminal behavior. A consistent theme throughout the letters is Andrew's message that it is "never too late to change for the better and come out of a bad situation with a positive mindset and demeanor."

Andrew's efforts at rehabilitation have been remarkable. His current achievements are a clear indication that there can be a positive outcome from this very painful experience.

While incarcerated, Andrew has formulated concrete plans to educate others so they can avoid the pitfalls that have befallen him. He has undertaken a plan to one day use his present journey to educate others.

His positive outlook and commitment to being a better person and father demonstrate that he is at low risk of recidivism when he is released from incarceration.

Andrew will be sufficiently punished for his conduct should the Court impose a sentence below the advisory guideline range. In addition, a substantial period of supervised release will be imposed as well as additional special conditions of supervision. Furthermore, Andrew faces serious collateral consequences as he will need to register as a sex offender which will impact and restrict his employment and residential opportunities in the future, and that he will need to abide by post-release conditions requiring sex offender counseling.

He remains committed to providing for his children and family once he is released from prison.

## CONCLUSION

The evidence before this Court establishes that a sentence within the advisory Guidelines range is inappropriate and that incarcerating Andrew Reiner for anywhere near the recommended sentencing range will not further the purposes of sentencing. Mr. Reiner has shown genuine remorse, a desire to be rehabilitated, and dedicated to become a better person. He also has the support of a close network of family and friends. He has shown that the punishment he has already endured has motivated significant personal development and will provide deterrence and promote rehabilitation. A non-guideline sentence will allow Mr. Reiner to return to his family and community as soon as possible, and when combined with a period of supervised release and mandatory counseling, such a sentence will best promote change in Mr. Reiner's behavior and life and will sufficiently address any concerns of recidivism.

**DATED**: Buffalo, New York, December 8, 2017

Respectfully submitted,

**/s/ MaryBeth Covert**
MaryBeth Covert
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341, (716) 551-3346 (Fax)
marybeth_covert@fd.org
Counsel for Defendant Andrew Reiner

**TO:** Scott Allen
Assistant United States Attorney

Lindsay Maza
United States Probation Officer Specialist